## HODGES v. UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE
EASTERN DISTRICT OF ARKANSAS.

No. 14 of October Term, 1905.—Submitted October 19, 1905.—Restored to the docket,
for oral argument, November 6, 1905.—Argued April 23, 1906.—Decided May 28,
1906.—Opinion withheld until dissent filed, October 24, 1906.

The Fourteenth and Fifteenth Amendments operate solely on state action
and not on individual action. Unless the Thirteenth Amendment vests
jurisdiction in the National Government, the remedy for wrongs com-
mitted by individuals on persons of African descent is through state
action and state tribunals, subject to supervision of this court by writ
of error in proper cases.

Notwithstanding the adoption of the Thirteenth, Fourteenth and Fifteenth
Amendments, the National Government still remains one of enumerated
powers, and the Tenth Amendment is not shorn of its vitality.

Slavery and involuntary servitude as denounced by the Thirteenth Amend-
ment mean a condition of enforced compulsory service of one to another;
and while the cause inciting that amendment was the emancipation of
the colored race, it reaches every race and every individual.

The result of the Amendments to the Constitution adopted after the Civil
War was to abolish slavery, and to make the emancipated slaves citizens

and not wards of the Nation over whom Congress retained jurisdiction. This decision of the people is binding upon the courts; and they cannot attempt to determine whether it was the wiser course.

The United States court has no jurisdiction under the Thirteenth Amendment or sections 1978, 1979, 5508, 5510, Revised Statutes, of a charge of conspiracy made and carried out in a State to prevent citizens of African descent, because of their race and color, from making or carrying out contracts and agreements to labor.

ON October 8, 1903, the grand jury returned into the District Court of the United States for the Eastern District of Arkansas an indictment charging that the defendants, (now plaintiffs in error,) with others, "did knowingly, willfully and unlawfully conspire to oppress, threaten and intimidate Berry Winn, Dave Hinton, Percy Legg, Joe Mardis, Joe McGill, Dan Shelton, Jim Hall and George Shelton, citizens of the United States of African descent, in the free exercise and enjoyment of rights and privileges secured to them and each of them by the Constitution and laws of the United States and because of their having exercised the same, to wit: The said Berry Winn, Dave Hinton, Percy Legg, Joe Mardis, Joe McGill, Dan Shelton, Jim Hall and George Shelton, being then and there persons of African descent and citizens of the United States and of the State of Arkansas, had then and there made and entered into contracts and agreements with James A. Davis and James S. Hodges,[1] persons then and there doing business under the name of Davis & Hodges as copartners, carrying on the business of manufacturers of lumber at White Hall, in said county, the said contracts being for the employment by said firm of the said Berry Winn, Dave Hinton, Percy Legg, Joe Mardis, Joe McGill, Dan Shelton, Jim Hall and George Shelton as laborers and workmen in and about their said manufacturing establishment, by which contracts the said Berry Winn, Dave Hinton, Percy Legg, Joe Mardis, Joe McGill, Dan Shelton, Jim Hall and George Shelton were on their part to perform labor and services at

---

[1] Not the plaintiff in error.

said manufactory and were to receive, on the other hand, for their labor and services, compensation, the same being a right and privilege conferred upon them by the Thirteenth Amendment to the Constitution of the United States and the laws passed in pursuance thereof, and being a right similar to that enjoyed in said State by the white citizens thereof, and while the said Berry Winn, Dave Hinton, Percy Legg, Joe Mardis, Joe McGill, Dan Shelton, Jim Hall, and George Shelton were in the enjoyment of said right and privilege the said defendants did knowingly, willfully, and unlawfully conspire as aforesaid to injure, oppress, threaten, and intimidate them in the free exercise and enjoyment of said right and privilege, and because of their having so exercised the same and because they were citizens of African descent, enjoying said right, by then and there notifying the said Berry Winn, Dave Hinton, Percy Legg, Joe Mardis, Joe McGill, Dan Shelton, Jim Hall, and George Shelton that they must abandon said contracts and their said work at said mill and cease to perform any further labor thereat, or receive any further compensation for said labor, and by threatening in case they did not so abandon said work to injure them, and by thereafter then and there willfully and unlawfully marching and moving in a body to and against the place of business of the said firm while the said Berry Winn, Dave Hinton Percy Legg, Joe Mardis, Joe McGill, Dan Shelton, Jim Hall, and George Shelton were engaged thereat and while they were in the performance of said contracts thereon, the said defendants being then and there armed with deadly weapons, threatening and intimidating the said workmen there employed, with the purpose of compelling them by violence and threats and otherwise to remove from said place of business, to stop said work and to cease the enjoyment of said right and privilege, and by then and there willfully, deliberately, and unlawfully compelling said Berry Winn, Dave Hinton, Percy Legg, Joe Mardis, Joe McGill, Dan Shelton, Jim Hall, and George Shelton to quit said work and

abandon said place and cease the free enjoyment of all advantages under said contracts, the same being so done by said defendants and each of them for the purpose of driving the said Berry Winn, Dave Hinton, Percy Legg, Joe Mardis, Joe McGill, Dan Shelton, Jim Hall, and George Shelton from said place of business and from their labor because they were colored men and citizens of African descent, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States."

A demurrer to this indictment, on the ground that the offense created by sections 1977 and 5508, Rev. Stat., under which it was found, was not within the jurisdiction of the courts of the United States, but was judicially cognizable by state tribunals only, was overruled, a trial had, and the three plaintiffs in error found guilty, sentenced separately to imprisonment for different terms and to fine, and to be thereafter ineligible to any office of profit or trust created by the Constitution or laws of the United States. Sections 1977, 1978, 1979, 5508 and 5510 read as follows:

"SEC. 1977. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, to be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

"SEC. 1978. All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

"SEC. 1979. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

secured by the Constitution and laws, shall be. liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

"SEC. 5508. If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured, they shall be fined not more than five thousand dollars and imprisoned not more than ten years; and shall, moreover, be thereafter ineligible to any office, or place of honor, profit, or trust created by the Constitution or laws of the United States."

"SEC. 5510. Every person who, under color of any law, statute, ordinance, regulation, or custom, subjects, or causes to be subjected, any inhabitant of any State or Territory to the deprivation of any rights, privileges, or immunities, secured or protected by the 'Constitution and laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color or race, than are prescribed for the punishment of citizens, shall be punished by a fine of not more than one thousand dollars, or by imprisonment not more than one year, or by both."

There being constitutional questions involved, the judgment was brought directly to this court on writ of error.

*Mr. James P. Clarke, Mr. L. C. Going* and *Mr. J. F. Gautney,* for plaintiffs in error, submitted:

Plaintiffs in error demurred and contended below and contend here that—

The matters, things and allegations therein contained do not constitute a public offense against the laws of the United States; section 1977 of the Revised Statutes of the United

States, upon which the indictment is founded, is unconstitutional; section 1977 of the Revised Statutes, when taken and construed with section 5508 of the same, in so far as it creates offenses and imposes penalties, is in violation of the Constitution; the offenses created by the said sections are not within the jurisdiction of the United States, and are cognizable before state tribunals only.

The court below overruled the demurrer and sustained the position of the Government on the ground that the right enjoyed by the African citizens set out in the indictment was a right secured to them under the Constitution and the laws of the United States. But see where in *United States* v. *Cruikshank*, 92 U. S. 542, this court held all rights are not so granted or secured. Whether one is so or not is a question of law to be determined by the court, not the prosecutor.

This case is resolved into a simple question: Is the right to contract one guaranteed or secured by the Constitution or laws of the United States? Or, is the right of a citizen of African descent to make or enforce a contract a right granted or secured to him by the Constitution or laws of the United States?

The court below failed to recognize the distinction between rights declared and recognized, but not granted or secured by the Constitution and laws. Such a distinction exists and has been noticed by this court. *Logan* v. *United States*, 144 U. S. 263, 286.

Citizenship under the laws of the various States of this Union is not essential to the right to contract. Aliens are permitted to contract, and to have and enforce the same rights in reference thereto as citizens. The right to contract existed long prior to the Declaration of Independence, or the adoption of the Constitution of the United States. The Thirteenth Amendment did nothing more than to create or make a freeman of a slave. Since he became a freeman the municipal laws of the land give to him the right to contract, to sue and be sued in the State or municipality in which he resides.

The right to pursue or follow any of the ordinary vocations of life are not created by the Constitution or laws of the United States, but are among the inherent and inalienable rights of man, and are, therefore, not dependent for their existence upon the Constitution. *Butchers' Union* v. *Crescent City Co.*, 111 U. S. 746; *Civil Rights Cases*, 109 U. S. 3, 13.

Admitting the facts alleged in the indictment to be true, it does not follow that the conspiracy upon a part of certain individuals to intimidate or interfere with a Negro citizen in the performance of his contract fastens upon the Negro any badge of slavery any more than it would be held to fasten a badge of slavery upon a white man if his right to contract should be interfered with by intimidations or threats.

The most that can be said of the acts alleged in the indictment is that they are a violation or in violation of the criminal laws of the State of Arkansas. The Thirteenth Amendment has respect not to distinction of race or class or color, but to slavery.

The Constitution prohibits a State from passing a law impairing the obligation of a contract. This did not give Congress power to provide laws for general enforcement of contracts, nor power to invest the courts of the United States with power over contracts so as to enable parties to sue upon them in these courts. *Civil Rights Cases*, 109 U. S. 3.

Examples of some of the rights guaranteed or secured by the Constitution and laws of the United States are those such as patents, trade-marks, right to homestead public lands, to vote in Federal elections, etc. *United States* v. *Waddell*, 112 U. S. 76.

But a conspiracy to intimidate and compel officers of a mining company to discharge their employés, or to compel the employés to leave the service of the company, is not an offense against the laws of the United States. *Pettibone* v. *United States*, 149 U. S. 202.

The Emancipation Proclamation by removing the disability of slavery made the Negro a citizen and placed him upon

the same plane before the law as the white race. *United States* v. *Rhodes*, 1 Abb. (U. S.) 28; 1 Kent Com., 298 and note; *State* v. *Manuel*, 4 Dev. & Batt. (N. C.) 28.

In the last-mentioned authority will be found an unanswerable argument upon that proposition. In discussing the question of a free Negro, Judge Gaston, speaking for the court, said: "Under the laws of this State, all human beings within it who are not slaves fall within one of two classes, aliens or citizens. Slaves manumitted here become free men, and all free persons born within the State are citizens."

This case was cited and approved in *State* v. *Newsom*, 5 Ired. (N. C.) 250.

If, on the other hand, the African citizen acquired his rights of life, liberty and pursuit of happiness, which include the right to contract, from the statutes under consideration or the Thirteenth Amendment, he has acquired rights, privileges and protection by virtue of that instrument which the white man, by whom it was made, did not and could not secure to himself.

According to the theory of the Government in this case, when the *color* is changed and the white man becomes the conspirator, and the citizen of African descent the victim, the strong arm of the Government can and will be stretched forth to protect the citizen of African descent. It cannot be possible that the Thirteenth Amendment can give to the Congress of the United States the right to enact a code of municipal laws merely for the purpose of protecting citizens of African descent in their right to contract.

If individuals should undertake to enforce upon citizens of African descent or upon any other persons any form or badge of slavery, it cannot be doubted that this would make a cause of action cognizable in the United States courts.

The *Peonage Cases*, 197 U. S. 207, are all illustrations of the applicability of the laws under discussion. As to the constitutionality of section 5519 of the Revised Statutes, see *United States* v. *Harris*, 106 U. S. 626.

*The Attorney General*, with whom *Mr. Milton D. Purdy*, Assistant to the Attorney General, and *Mr. Otis J. Carlton*, Special Assistant to the Attorney General, were on the brief for the United States.

The question of law is:

Has a colored citizen of the United States of African descent a right secured to him by the Constitution or laws of the United States to work at any particular occupation or calling—as, for example, in the capacity of a common laborer in the manufacture of lumber—and, therefore, free from injury, oppression, or interference on the part of individual citizens, when the motive for such injury, oppression, or interference arises solely from the fact that such laborer is a colored person of African descent?

This question does not involve the constitutionality of § 5508, Rev. Stat., which is not open to doubt, *Motes* v. *United States*, 178 U. S. 458, but simply whether the phrase "any right or privilege secured to him by the Constitution or laws of the United States," includes the right charged in this indictment as having been secured to the colored citizens who were driven away from work by the unlawful acts of individuals. In view of *United States* v. *Cruikshank*, 92 U. S. 545, and *Logan* v. *United States*, 144 U. S. 263, 293; it is vain to contend that the Federal Constitution secures to a citizen of the United States the right to work at a given occupation or particular calling free from injury, oppression, or interference by individual citizens. Even though such right be a natural or inalienable right, the duty of protecting the citizen in the enjoyment of such right, free from individual interference, rests alone with the State.

Unless, therefore, the additional element of infliction of an injury upon one individual citizen by another, solely on account of his color, be sufficient ground to redress such injury the individual citizen suffering such injury must be left for redress of his grievance to the state laws. In what may be called the old Constitution—the Constitution as it

stood before the war amendments—there were no provisions which could be invoked to support § 1977. Art. IV, section 2, provided: "The citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." If this section were not inapplicable on other grounds, it could not be invoked here, for it is prohibitive only of state action. *Paul* v. *Virginia*, 8 Wall. 168; *Ward* v. *Maryland*, 12 Wall. 418; *Slaughter House Cases*, 16 Wall. 36; *United States* v. *Harris*, 106 U. S. 629, 643; *Blake* v. *McClung*, 172 U. S. 236.

And for a similar reason the power can not be sought in the Fourteenth Amendment. *United States* v. *Reese*, 92 U. S. 214; *United States* v. *Cruikshank*, 92 U. S. 542; *Virginia* v. *Rives*, 100 U. S. 313; *Ex parte Virginia*, 100 U. S. 339; *Civil Rights Cases*, 109 U. S. 3; *United States* v. *Harris*, 106 U. S. 629; *James* v. *Bowman*, 190 U. S. 127.

Under the Thirteenth Amendment, however, Congress may enact laws operating primarily upon individuals, *United States* v. *Clyatt*, 197 U. S. 207, and if § 1977 can not be sustained under that Amendment the Government's case must fail. The Thirteenth Amendment was intended to secure to the colored race practical freedom. For its history, and history of the Civil Rights Bill, see Cong. Globe, Vol. 69, pp. 474, 503; speeches of Mr. Howard, Mr. Trumbull, Chairman of the Judiciary Committee, and Mr. Cowan.

And as to the scope of the Amendment and the legislation under it see *Slaughter House Cases*, 16 Wall. 36; *United States* v. *Harris*, 106 U. S. 629, 641; *Clyatt* v. *United States*, 97 U. S. 207.

The Civil Rights Act of 1875, provided that the Negro, equally with the white man, should have accommodation in public places of amusement, hotels, and public conveyances, but this court held in the *Civil Rights Cases*, 109 U. S. 3, that the denial of the *social* rights attempted to be secured by the act of 1875, as distinguished from the *fundamental* rights secured by the act of 1866, did not amount to the imposition of a badge of slavery.

The Thirteenth Amendment has been considered in some

other cases in this court, but an examination of them is not material to the discussion of this case. *Plessy* v. *Ferguson*, 163 U. S. 537; *Robertson* v. *Baldwin*, 165 U. S. 275.

This court has never held that the Thirteenth Amendment was not broad enough to permit of legislation such as is contained in § 1977, Rev. Stat. We have seen, on the contrary, that Mr. Justice Field and Mr. Justice Harlan have given the support of their opinions to the validity of the parent enactment. *Slaughter House Cases,* 16 Wall. 36, 90, 91; *Civil Rights Cases,* 109 U. S. 3, 35.

.The validity of the act of April 9, 1866, was sustained in several cases in the lower courts of the United States, and in the state courts. *United States* v. *Rhodes,* 1 Abb. (U. S.) 28; *Matter of Elizabeth Turner,* 1 Abb. (U. S.) 84; *Smith* v. *Moody,* 26 Indiana, 299, 306; *People* v. *Washington,* 36 California, 658; *United States* v. *Cruikshank,* 1 Woods, 308, 319.

The act of 1866, was held to be unconstitutional in a dissenting opinion in *People* v. *Washington, supra,* and in *Bowlin* v. *Commonwealth,* 2 Bush (Ky.), 5.

From the above authorities and extracts from speeches in Congress, the Government contends that the people, having clear notions of the status of the colored race and of what attempts would be made to return it to its servile condition, intended by the Thirteenth Amendment to grant and secure practical freedom. It outrages our feelings of humanity to believe that the men who had fought to free the slaves merely intended to sever the legal ligament which bound the slave to his master, leaving the latter at liberty to cut him off from the fundamental rights which white men enjoyed. Such a narrow construction leaves the black race in a state made worse by their emancipation by the breaking of the cord of self-interest which bound the slaveholder to take care of his property. That motive would disappear with the adoption of the Amendment, and the people must have foreseen that the former slaveholders would strive, by individual action and through the reconstructed legislatures

in the late rebellious States, to prevent the freedmen from acquiring property, suing in the courts, giving evidence, and in a great variety of ways endeavor to prevent those whom they regarded as intended by the Almighty to be bondsmen from enjoying the practical rights of freemen.

For this purpose the people used in the Amendment language which this court has said permits Congress to enact legislation operating directly to punish the acts of individuals, not sanctioned by any color of state authority. *Clyatt* v. *United States,* 197 U. S. 207.

The framers of that Amendment were familiar with the provisions of the Constitution, and with that which gave Congress power "To make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the Government of the United States, or in any Department or officer thereof."

As to what is appropriate legislation, see cases upholding the fugitive slave laws, *Prigg* v. *Pennsylvania,* 16 Pet. 539; *Ableman* v. *Booth,* 21 How. 506. And legislation, like § 1977, which declares that the black and white races shall be upon an equality in the enjoyment of these rights, is apt and appropriate.

The intent of Congress, expressed in sections 1977 and 5508, is to make it an offense for individuals, acting in combination, to injure or oppress the Negro, solely because of his color, in his right to make and enforce contracts.

If rights are granted and secured by constitutional enactments, Congress may legislate to protect those rights against individual action. *United States* v. *Reese,* 92 U. S. 214; *Strauder* v. *West Virginia,* 100 U. S. 303; *Ex parte Virginia,* 100 U. S. 339; *Ex parte Yarbrough,* 110 U. S. 651; *United States* v. *Waddell,* 112 U. S. 76; *Baldwin* v. *Franks,* 120 U. S. 678; *Logan* v. *United States,* 144 U. S. 263; *Motes* v. *United States,* 178 U. S. 458.

In *Clyatt* v. *United States,* 197 U. S. 207, it was held that

the Thirteenth Amendment, unlike the Fourteenth and Fifteenth, gives Congress authority to enact legislation operating upon individuals, and that the Fourteenth Amendment did not take away from Congress the power to pass legislation operating on individuals.

*Scott* v. *Sandford*, 19 How. 393, held that slaves were not citizens. The Emancipation Proclamation made them free, and it may be admitted, made them citizens of the United States, but it did not secure to them practical freedom. That was done by the Thirteenth Amendment, and because, under that Amendment Congress may enact legislation acting primarily upon individuals, it may punish those who attempt by concerted action to deprive the Negro of his right to contract solely for the reason that he is a Negro. If a conspiracy should be entered into by blacks to hinder a white man, solely on account of his color, from making and enforcing contracts, Congress could legislate for such a case. That question, however, does not arise in this case.

If there be doubt whether the legislation of Congress, § 1977, Rev. Stat., be constitutional, the doubt should be resolved in favor of its validity according to the rule expressed in *Ogden* v. *Saunders*, 12 Wheat. 213.

The *Civil Rights Cases*, 109 U. S. 3,—and see statement of effect of opinion on p. 35—not only sustains this case, but it is sustained on the broad ground that there inheres in, and belongs to every man of every race everywhere within the jurisdiction of the United States, all of the essential rights and privileges of a free man, and that the National Government has the right by direct legislation to protect him in the enjoyment of his freedom.

This case was originally submitted on briefs. By the court's direction, it has also been orally argued by the Government. Exigencies of the public welfare have little place in a court of justice in the interpretation of the laws and the Constitution. And yet they have some place. They admonish us to search well all the sources of National power.

It is not legally important that in this or any other State the remedy under the state laws is useless. If that be true, that consideration can not control the interpretation of the law and the interpretation of the Constitution. The war of races is no longer a sectional war; it is as bitter in the State of Chase and Giddings as it is in the State of Arkansas. If the Negro who is in our midst can be denied the right to work, and must live on the outskirts of civilization, he will become more dangerous than the wild beasts, because he has a higher intelligence than the most intelligent beast. He will become an outcast lurking about the borders and living by depredation.

There is but one refuge from that condition, and that is to put himself back under some chosen master in the condition of slavery itself. If the Nation has not the power at the very threshold to say to those who declare against this or other races, that as a race it shall not have one of the most essential rights of a free man, it is powerless indeed. The Government submits that it has that power. It was given to the Nation by the Thirteenth Amendment, and this case is brought within it.

MR. JUSTICE BREWER, after making the foregoing statement, delivered the opinion of the court.

While the indictment was founded on sections 1977 and 5508, we have quoted other sections to show the scope of the legislation of Congress on the general question involved.

That prior to the three *post bellum* Amendments to the Constitution the National Government had no jurisdiction over a wrong like that charged in this indictment is conceded; that the Fourteenth and Fifteenth Amendments do not justify the legislation is also beyond dispute, for they, as repeatedly held, are restrictions upon state action, and no action on the part of the State is complained of. Unless, therefore, the Thirteenth Amendment vests in the Nation the jurisdiction claimed the remedy must be sought through

state action and in state tribunals subject to the supervision of this court by writ of error in proper cases.

In the *Slaughter House Cases,* 16 Wall. 36, 76, in defining the privileges and immunities of citizens of the several States, this is quoted from the opinion of Mr. Justice Washington in *Corfield* v. *Coryell,* 4 Wash. Cir. Ct. 371, 380.

" 'The inquiry,' he says, 'is, what are the privileges and immunities of citizens of the several States? We feel no hesitation in confining these expressions to those privileges and immunities which are, in their nature, fundamental; which belong, of right, to the citizens of all free governments; and which have, at all times, been enjoyed by citizens of the several States which compose this union, from the time of their becoming free, independent and sovereign. What these fundamental principles are, it would be more tedious than difficult to enumerate. They may, however, be all comprehended under the following general heads: protection by the Government, the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject, nevertheless, to such restraints as the Government may prescribe for the general good of the whole.' "

And after referring to other cases this court added (p. 77):

"It would be the vainest show of learning to attempt to prove by citations of authority, that up to the adoption of the recent Amendments no claim or pretence was set up that those rights depended on the Federal Government for their existence or protection, beyond the very few express limitations which the Federal Constitution imposed upon the States— such, for instance, as the prohibition against *ex post facto* laws, bills of attainder, and laws impairing the obligation of contracts. But with the exception of these and a few other restrictions, the entire domain of the privileges and immunities of citizens of the States, as above defined, lay within the constitutional and legislative power of the States, and without that of the Federal Government."

Notwithstanding the adoption of these three Amendments, the National Government still remains one of enumerated powers, and the Tenth Amendment, which reads "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people," is not shorn of its vitality. True the Thirteenth Amendment grants certain specified and additional power to Congress, but any Congressional legislation directed against individual action which was not warranted before the Thirteenth Amendment must find authority in it. And in interpreting the scope of that Amendment it is well to bear in mind the words of Mr. Chief Justice Marshall, in *Gibbons* v. *Ogden*, 9 Wheat. 1, 188, which, though spoken more than four score years ago, are still the rule of construction of constitutional provisions:

"As men whose intentions require no concealment, generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our Constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said."

The Thirteenth Amendment reads:

"SEC. 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

"SEC. 2. Congress shall have power to enforce this article by appropriate legislation."

The meaning of this is as clear as language can make it. The things denounced are slavery and involuntary servitude, and Congress is given power to enforce that denunciation. All understand by these terms a condition of enforced compulsory service of one to another. While the inciting cause of the Amendment was the emancipation of the colored race, yet it is not an attempt to commit that race to the care of the Nation. It is the denunciation of a condition and not a decla-

ration in favor of a particular people.   It reaches every race and every individual, and if in any respect it commits one race to the Nation it commits every race and every individual thereof.   Slavery or involuntary servitude of the Chinese, of the Italian, of the Anglo-Saxon are as much within its compass as slavery or involuntary servitude of the African.   Of this Amendment it was said by Mr. Justice Miller in *Slaughter House Cases*, 16 Wall. 36, 69, "Its two short sections seem hardly to admit of construction."   And again: "To withdraw the mind from the contemplation of this grand yet simple declaration of the personal freedom of all the human race within the jurisdiction of this Government . .. . requires an effort, to say the least of it."

A reference to the definitions in the dictionaries of words whose meaning is so thoroughly understood by all seems an affectation, yet in Webster "slavery" is defined as "the state of entire subjection of one person to the will of another."   Even the secondary meaning given recognizes the fact of subjection, as "one who has lost the power of resistance; one who surrenders himself to any power whatever; as a slave to passion, to lust, to strong drink, to ambition," and "servitude" is by the same authority declared to be "the state of voluntary or compulsory subjection to a master."

It is said, however, that one of the disabilities of slavery, one of the indicia of its existence, was a lack of power to make or perform contracts, and that when these defendants, by intimidation and force, compelled the colored men named in the indictment to desist from performing their contract they to that extent reduced those parties to a condition of slavery, that is, of subjection to the will of defendants, and deprived them of a freeman's power to perform his contract.   But every wrong done to an individual by another, acting singly or in concert with others, operates *pro tanto* to abridge some of the freedom to which the individual is entitled.   A freeman has a right to be protected in his person from an assault and battery.   He is entitled to hold his property safe from tres-

pass or appropriation, but no mere personal assault or tres-pass or appropriation operates to reduce the individual to a condition of slavery. Indeed, this is conceded by counsel for the Government, for in their brief (after referring to certain decisions of this court) it is said:

"With these decisions, and many others that might be cited, before us, it is vain to contend that the Federal Constitution secures to a citizen of the United States the right to work at a given occupation or particular calling free from injury, oppression, or interference by individual citizens."

["Even though such right be a natural or inalienable right, the duty of protecting the citizen in the enjoyment of such right, free from individual interference, rests alone with the State.

"Unless, therefore, the additional element, to wit, the infliction of an injury upon one individual citizen by another, solely on account of his color, be sufficient ground to redress such injury the individual citizen suffering such injury must be left for redress of his grievance to the state laws."

The logic of this concession points irresistibly to the contention that the Thirteenth Amendment operates only to protect the African race. This is evident from the fact that nowhere in the record does it appear that the parties charged to have been wronged by the defendants had ever been themselves slaves, or were the descendants of slaves. They took no more from the Amendment than any other citizens of the United States. But if, as we have seen, that denounces a condition possible for all races and all individuals, then a like wrong perpetrated by white men upon a Chinese, or by black men upon a white man, or by any men upon any man on account of his race, would come within the jurisdiction of Congress, and that protection of individual rights which prior to the Thirteenth Amendment was unquestionably within the jurisdiction solely of the States, would by virtue of that Amendment be transferred to the Nation, and subject to the legislation of Congress.

But that it was not the intent of the Amendment to denounce every act done to an individual which was wrong if done to a free man and yet justified in a condition of slavery, and to give authority to Congress to enforce such denunciation, consider the legislation in respect to the Chinese. In slave times in the slave States not infrequently every free Negro was required to carry with him a copy of a judicial decree or other evidence of his right to freedom or be subject to arrest. That was one of the incidents or badges of slavery. By the act of May 5, 1892, Congress required all Chinese laborers within the limits of the United States to apply for a certificate, and any one who after one year from the passage of the act should be found within the jurisdiction of the United States without such certificate, might be arrested and deported. In *Fong Yue Ting* v. *United States,* 149 U. S. 698, the validity of the Chinese deportation act was presented, elaborately argued, and fully considered by this court. While there was a division of opinion, yet at no time during the progress of the litigation, and by no individual, counsel, or court connected with it, was it suggested that the requiring of such a certificate was evidence of a condition of slavery or prohibited by the Thirteenth Amendment.

One thing more: At the close of the civil war, when the problem of the emancipated slaves was before the Nation, it might have left them in a condition of alienage, or established them as wards of the Government like the Indian tribes, and thus retained for the Nation jurisdiction over them, or it might, as it did, give them citizenship. It chose the latter. By the Fourteenth Amendment it made citizens of all born within the limits of the United States and subject to its jurisdiction. By the Fifteenth it prohibited any State from denying the right of suffrage on account of race, color or previous condition of servitude, and by the Thirteenth it forbade slavery or involuntary servitude anywhere within the limits of the land. Whether this was or was not the wiser way to deal with the great problem is not a matter for the courts to

consider. It is for us to accept the decision, which declined to constitute them wards of the Nation or leave them in a condition of aliénage where they would be subject to the jurisdiction of Congress, but gave them citizenship, doubtless believing that thereby in the long run their best interests would be subserved, they taking their chances with other citizens in the States where they should make their homes.

For these reasons we think the United States court had no jurisdiction of the wrong charged in the indictment.

*The judgments are reversed, and the case remanded with instructions to sustain the demurrer to the indictment.*

Mr. Justice Brown concurs in the judgments.

Mr. Justice Harlan, with whom concurs Mr. Justice Day, dissenting.[1]

The plaintiffs in error were indicted with eleven others in the District Court of the United States, Eastern District of Arkansas, for the crime of having knowingly, wilfully and unlawfully conspired to oppress, threaten and intimidate Berry Winn, Dave Hinton, Percy Legg, Joe Mardis, Joe McGill, Dan Shelton, Jim Hall and George Shelton, persons of African descent and citizens of the United States and of Arkansas, in the free exercise and enjoyment of the right and privilege— alleged to be secured to them respectively by the Constitution and laws of the United States—of disposing of their labor and services by contract and of performing the terms of such contract without discrimination against them, because of their race or color, and without illegal interference or by violent means.[2]

---

[1] Dissent announced May 28, 1906, but not filed until October 24, 1906.

[2] The indictment charged that "the said Berry Winn, Dave Hinton, Percy Legg, Joe Mardis, Joe McGill, Dan Shelton, Jim Hall and George Shelton, being then and there persons of African descent, and citizens of the United States and of the State of Arkansas, had then and there

The indictment was based primarily upon section 5508 of the Revised Statutes, which provides: " SEC. 5508. If two or more persons conspire to injure, oppress, threaten or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the

---

made and entered into contracts and agreements with James A. Davis and James S. Hodges, persons then and there doing business under the name of Davis & Hodges, as copartners carrying on the business of manufacturers of lumber at White Hall, in said county, the said contracts being for the employment by said firm of the said Berry Winn, Dave Hinton, Percy Legg, Joe Mardis, Joe McGill, Dan Shelton, Jim Hall and George Shelton, as laborers and workmen in and about their said manufacturing establishment, by which contracts the said Berry Winn, Dave Hinton, Percy Legg, Joe Mardis, Joe McGill, Dan Shelton, Jim Hall and George Shelton, were on their part to perform labor and services at said manufactory and were to receive on the other hand for their labor and services compensation, the same being a right and privilege conferred upon them by the Thirteenth Amendment to the Constitution of the United States and the laws passed in pursuance thereof, and being a right similar to that enjoyed in said State by the white citizens thereof; and while the said Berry Winn, Dave Hinton, Percy Legg, Joe Mardis, Joe McGill, Dan Shelton, Jim Hall and George Shelton, were in the enjoyment of said right and privilege the said defendants did knowingly, wilfully and unlawfully conspire as aforesaid to injure, oppress, threaten and intimidate them in the free exercise and enjoyment of said right and privilege, and because of their having so exercised the same and because they were citizens of African descent enjoying said right, by then and there notifying the said Berry Winn, Dave Hinton, Percy Legg, Joe Mardis, Joe McGill, Dan Shelton, Jim Hall and George Shelton, that they must abandon said contracts and their said work at said mill and cease to perform any further labor thereat, or receive any further compensation for said labor, and by threatening in case they did not so abandon said work to injure them, and by thereafter then and there wilfully and unlawfully marching and moving in a body to and against the places of business of the said firm while the said Berry Winn, Dave Hinton, Percy Legg, Joe Mardis, Joe McGill, Dan Shelton, Jim Hall and George Shelton, were engaged thereat and while they were in the performance of said contracts thereon, the said defendants being then and there armed with deadly weapons, threatening and intimidating the said workmen there employed, with the purpose of compelling them by violence and threats, and otherwise to remove from said place of business, to stop said work and to cease the enjoyment of said right and privilege, and by then and there wilfully, deliberately and unlawfully

same; or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured, they shall be fined not more than five thousand dollars and imprisoned not more than ten years, and shall, moreover, be thereafter ineligible to any office, or place of honor, profit or trust created by the Constitution or laws of the United States."

Other sections of the statutes relating to civil rights, and referred to in the discussion at the bar, although not, perhaps, vital to the decision of the present case, are as follows: "Sec. 1977. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." "Sec. 1978. All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." "Sec. 1979. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Consti-

---

compelling said Berry Winn, Dave Hinton, Percy Legg, Joe Mardis, Joe McGill, Dan Shelton, Jim Hall and George Shelton, to quit said work and abandon said place and cease the free enjoyment of all advantages under said contracts, the same being so done by said defendants and each of them for the purpose of driving the said Berry Winn, Dave Hinton, Percy Legg, Joe Mardis, Joe McGill, Dan Shelton, Jim Hall and George Shelton, from said place of business and from their labor because they were colored men and citizens of African descent, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States.

tution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." "SEC. 5510. Every person who, under color of any law statute, ordinance, regulation, or custom, subjects, or causes to be subjected, any inhabitant of any State or Territory to the deprivation of any rights, privileges, or immunities, secured or protected by the Constitution and laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color or race, than are prescribed for the punishment of citizens, shall be punished by a fine of not more than one thousand dollars, or by imprisonment not more than one year, or by both."

A demurrer to the indictment was overruled, and the defendants having pleaded not guilty, they were tried before a jury, and some of them—the present plaintiffs in error—were convicted of the crime charged, were each fined one hundred dollars and ordered to be imprisoned for one year and a day. A motion for a new trial having been denied, they have brought the case to this court.

In our consideration of the questions now raised it must be taken, upon this record, as conclusively established by the verdict and judgment—

That certain persons—the said Berry Winn and others above named with him—citizens of the United States, and of Arkansas, and of African descent, entered into a contract, whereby they agreed to perform for compensation service and labor in and about the manufacturing business in that State of a private individual;

That those persons, in execution of their contract, entered upon and were actually engaged in performing the work they agreed to do, when the defendants—the present plaintiffs in error—knowingly and wilfully conspired to injure, oppress, threaten and intimidate such laborers, solely because of their having made that contract and *because of their race and color*, in the free exercise of their right to dispose of their labor, and

prevent them from carrying out their contract to render such service and labor;

That, in the prosecution of such conspiracy, the defendants, by violent means, compelled those laborers, simply *"because they were colored men and citizens of African descent,"* to quit their work and abandon the place at which they were performing labor in execution of their contract; and,

That, in consequence of those acts of the defendant conspirators, the laborers referred to were hindered and prevented, *solely because of their race and color,* from enjoying the right by contract to dispose of their labor upon such terms and to such persons as to them seemed best.

Was the right or privilege of these laborers thus to dispose of their labor secured to them "by the Constitution or laws of the United States"? If so, then this case is within the very letter of section 5508 of the Revised Statutes, and the judgment should be affirmed if that section be not unconstitutional.

But I need not stop to discuss the constitutionality of section 5508. It is no longer open to question, in this court, that Congress may, by appropriate legislation, protect any right or privilege arising from, created or secured by, or dependent upon, the Constitution or laws of the United States. That is what that section does. It purports to do nothing more. In *Ex parte Yarbrough,* 110 U. S. 651, it was distinctly adjudged that section 5508 was a valid exercise of power by Congress. In *Logan* v. *United States,* 144 U. S. 263, 286, 293, this court stated that the validity of section 5508 had been sustained in the *Yarbrough case,* and, speaking by Mr. Justice Gray, said: "In *United States* v. *Reese,* 92 U. S. 214, 217, decided at October term, 1875, this court, speaking by Chief Justice Waite, said: 'Rights and immunities created by or dependent upon the Constitution of the United States can be protected by Congress. The form and the manner of the protection may be such as Congress, in the legitimate exercise of its legislative discretion, shall provide. These may be varied to meet the necessities of the particular right to be

protected.' " After referring to prior adjudications the court in the *Logan case* also unanimously declared: "The whole scope and effect of this series of decisions is that, while certain fundamental rights, recognized and declared, but not granted or created, in some of the Amendments to the Constitution, are thereby guaranteed only against violation or abridgment by the United States, or by the States, as the case may be, and cannot therefore be affirmatively enforced by Congress against unlawful acts of individuals; yet that *every* right *created by, arising under or dependent upon, the Constitution of the United States* may be protected and enforced by Congress by such means and in such manner as Congress, in the exercise of the correlative duty of protection, or of the legislative powers conferred upon it by the Constitution, may in its discretion deem most eligible and best adapted to attain the object."

In *Motes* v. *United States*, 178 U. S. 458, 462, the language of the court was: "We have seen that by section 5508, of the Revised Statutes it is made an offense against the United States for two or more persons to conspire to injure, oppress, threaten or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States—the punishment prescribed being a fine of not more than $5,000, imprisonment not more than ten years, and ineligibility to any office or place of honor, profit or trust created by the Constitution or laws of the United States. And by section 5509 it is provided that if in committing the above offense any other felony or misdemeanor be committed, the offender shall suffer such punishment as is attached to such felony or misdemeanor by the laws of the State in which the offense is committed. No question has been made—indeed none could successfully be made—as to the constitutionality of these statutory provisions. *Ex parte Yarbrough*, 110 U. S. 651; *United States* v. *Waddell*, 112 U. S. 76. Referring to those provisions and to the clause of the Constitution giving Congress authority to pass all laws

necessary and proper for carrying into execution the powers specifically granted to it, and all other powers vested in the Government of the United States, or in any department or officer thereof, this court has said: 'In the exercise of this general power of legislation, Congress may use any means appearing to it most eligible and appropriate, which are adapted to the end to be accomplished, and are consistent with the letter and spirit of the Constitution.' *Logan* v. *United States*, 144 U. S. 263, 283."

In view of these decisions it is unnecessary to examine the grounds upon which the constitutionality of section 5508 rests; and I may assume that the power of the National Government, by appropriate legislation, to protect a right created by, derived from or dependent in any degree upon, the Constitution of the United States cannot be disputed.

I come now to the main question—whether a conspiracy or combination to forcibly prevent citizens of African descent, *solely because of their race and color*, from disposing of their labor by contract upon such terms as they deem proper and from carrying out such contract, infringes or violates a right or privilege created by, derived from or dependent upon the Constitution of the United States.

Before the Thirteenth Amendment was adopted the existence of freedom or slavery within any State depended wholly upon the constitution and laws of such State. However abhorrent to many was the thought that human beings of African descent were held as slaves and chattels, no remedy for that state of things as it existed in some of the States could be given by the United States in virtue of any power it possessed prior to the adoption of the Thirteenth Amendment. That condition, however, underwent a radical change when that Amendment became a part of the supreme law of the land and as such binding upon all the States and all the people, as well as upon every branch of government, Federal and state. By the Amendment it was ordained that "neither slavery nor involuntary servitude, except as a punishment for

crime whereof the party shall have been duly convicted, shall exist within the United States or any place subject to their jurisdiction"; and "Congress shall have power to enforce this article by appropriate legislation." Although in words and form prohibitive, yet, in law, by its own force, that Amendment destroyed slavery and all its incidents and badges, and established freedom.) [It also conferred upon every person within the jurisdiction of the United States (except those legally imprisoned for crime) the right, without discrimination against them on account of their race, to enjoy all the privileges that inhere in freedom. | It went further, however, and, by its second section, invested Congress with power, by appropriate legislation, to enforce its provisions. To that end, by direct, primary legislation, Congress may not only prevent the reestablishing of the institution of slavery, pure and simple, but may make it impossible that any of its incidents or badges should exist or be enforced in any State or Territory of the United States. It therefore became competent for Congress, under the Thirteenth Amendment, to make the establishing of slavery, as well as all attempts, whether in the form of a conspiracy or otherwise, to subject anyone to the badges or incidents of slavery *offenses against the United States*, punishable by fine or imprisonment, or both. And legislation of that character would certainly be appropriate for the protection of whatever rights were given or created by the Amendment. So, legislation making it an offense against the United States to conspire to injure or intimidate a citizen in the free exercise of any right secured by the Constitution is broad enough to embrace a conspiracy of the kind charged in the present indictment. "A right or immunity, whether created by the Constitution or only guaranteed by it, may be protected by Congress." This court so adjudged in *Strauder* v. *West Virginia*, 100 U. S. 303, 310, as it had previously adjudged in *Prigg* v. *Pennsylvania*, 16 Pet. 539, and in *United States* v. *Reese*, 92 U. S. 214. The colored laborers against whom the conspiracy in question was directed

owe their freedom as well as their exemption from the incidents and badges of slavery alone to the Constitution of the United States. Yet it is said that their right to enjoy freedom and to be protected against the badges and incidents of slavery is not secured by the Constitution or laws of the United States.

It may be also observed that the freedom created and established by the Thirteenth Amendment was further protected against assault when the Fourteenth Amendment became a part of the supreme law of the land; for that Amendment provided that no State shall deprive any person of life, liberty or property, without due process of law. To deprive any person of a privilege inhering in the freedom ordained and established by the Thirteenth Amendment is to deprive him of a privilege inhering in the liberty recognized by the Fourteenth Amendment. It is true that the present case is not one of deprivation by the constitution or laws of the *State* of the privilege of disposing of one's labor as he deems proper. But it is one of a combination and conspiracy by individuals acting in hostility to rights conferred by the Amendment that ordained and established freedom and conferred upon every person within the jurisdiction of the United States (not held lawfully in custody for crime) the privileges that are fundamental in a state of freedom, and which were violently taken from the laborers in question solely because of their race and color.

Let us see whether these principles do not find abundant support in adjudged cases.

One of the earliest cases arising under the Thirteenth Amendment was that of *United States* v. *Cruikshank, &c.,* 1 Woods, 308, 318, 320. It became necessary in that case for Mr. Justice Bradley, holding the Circuit Court, to consider the scope and effect of the Thirteenth Amendment and the extent of the power of Congress to enforce its provisions. Referring to the Thirteenth Amendment, that eminent jurist said that "this is not merely a prohibition against the passage

or enforcement of any law inflicting or establishing slavery or involuntary servitude, but it is a positive declaration that *slavery shall not exist.* . . . So, undoubtedly, by the Thirteenth Amendment, Congress has power to legislate for the entire eradication of slavery in the United States. This Amendment had an affirmative operation the moment it was adopted. It enfranchised four millions of slaves, if, indeed, they had not previously been enfranchised by the operation of the civil war. Congress, therefore, acquired the power not only to legislate for the eradication of slavery, but the power to give full effect to this bestowment of liberty on these millions of people. All this it essayed to do by the Civil Rights Bill, passed April 9, 1866, 14 Stat. 27, by which it was declared that all persons born in the United States, and not subject to a foreign power (except Indians, not taxed), should be citizens of the United States; and that such citizens, of every race and color, without any regard to any previous condition of slavery or involuntary servitude, should have *the same right* in every State and Territory *to make and enforce contracts*, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of persons and property, as is enjoyed by white citizens, and should be subject to like punishment, pains, and penalties, and to none other, any law, etc., to the contrary notwithstanding. It was supposed that the eradication of slavery and involuntary servitude of every form and description required that the slave should be made a citizen and placed on an entire equality before the law with the white citizen, and, therefore, that Congress had the power, under the Amendment, to declare and effectuate these objects. . . . Conceding this to be true (which I think it is), Congress then had the right to go further and to enforce its declaration by passing laws *for the prosecution and punishment of those who should deprive, or attempt to deprive, any person of the rights thus conferred upon them.* Without having this power.

Congress could not enforce the Amendment. *It cannot be doubted, therefore, that Congress had the power to make it a penal offense to conspire to deprive a person of, or to hinder him in, the exercise and enjoyment of the rights and privileges conferred by the Thirteenth Amendment and the laws thus passed in pursuance thereof.* But this power does not authorize Congress to pass laws for punishment of ordinary crimes and offenses against persons of the colored race or any other race. That belongs to the state government alone. All ordinary murders, robberies, assaults, thefts and offenses whatsoever are cognizable only in the state courts, unless, indeed, the State should deny to the class of persons referred to equal protection of the laws. . . . To illustrate: If in a community or neighborhood composed principally of whites, a citizen of African descent, or of the Indian race, not within the exception of the Amendment, should propose to lease and cultivate a farm, *and a combination should be formed to expel him and prevent him from the accomplishment of his purpose on account of his race or color, it cannot be doubted that this would be a case within the power of Congress to remedy and redress.* It would be a case of interference with the person's exercise of his equal rights as a citizen *because of his race.* But if that person should be injured in his person or property by any wrongdoer for the mere felonious or wrongful purpose of malice, revenge, hatred or gain, without any design to interfere with his rights of citizenship or equality before the laws, as being a person of a different race and color from the white race, it would be an ordinary crime, punishable by the state laws only."

This was followed by the *Civil Rights Cases,* 109 U. S. 3, 20, 22, in which the court passed upon the constitutionality of an act of Congress providing for the full and equal enjoyment by every race, equally, of the accommodations, advantages and facilities of theatres and public conveyances, and other places of public amusement; and in which the court also considered the scope and effect of the Thirteenth Amendment. In that case the court, speaking by Mr. Justice Brad-

ley—who, as we have seen, delivered the judgment in the case just cited—said: "*By its own unaided force and effect* it abolished slavery, and *established universal freedom.* Still, legislation may be necessary and proper to meet all the various cases and circumstances to be affected by it, and to prescribe proper modes of redress for its violation in letter or spirit. And such legislation *may be primary and direct in its character; for the Amendment is not a mere prohibition of state laws* establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States. It is true, that slavery cannot exist without law, any more than property in lands and goods can exist without law; and, therefore, the Thirteenth Amendment may be regarded as nullifying all state laws which establish or uphold slavery. [But it has a reflex character also, establishing and decreeing universal civil and political freedom throughout the United States; and it is assumed that the power vested in Congress to enforce the article by appropriate legislation clothes Congress with power to pass all laws *necessary and proper for abolishing all badges and incidents of slavery in the United States.*] . . . The long existence of African slavery in this country gave us very distinct notions of what it was, and what were its necessary incidents. Compulsory service of the slave for the benefit of the master, restraint of his movements except by the master's will, disability to hold property, *to make contracts,* to have a standing in court, to be a witness against a white person, and such like burdens and incapacities, *were the inseparable incidents of the institution.* Severer punishments for crimes were imposed on the slave than on free persons guilty of the same offenses. . . . We must not forget that the province and scope of the Thirteenth and Fourteenth Amendments are different; the former simply abolished slavery; the latter prohibited the States from abridging the privileges or immunities of citizens of the United States; from depriving them of life, liberty, or property without due process of law, and

from denying to any the equal protection of the laws. The Amendments are different, and the powers of Congress under them are different. What Congress has power to do under one, it may not have power to do under the other. Under the Thirteenth Amendment it has only to do with slavery and its incidents. Under the Fourteenth Amendment it has power to counteract and render nugatory all state laws and proceedings which have the effect to abridge any of the privileges or immunities of citizens of the United States, or to deprive them of life, liberty or property without due process of law, or to deny to any of them the equal protection of the laws. Under the Thirteenth Amendment, the legislation, so far as necessary or proper to eradicate *all forms and incidents of slavery* and involuntary servitude, *may be direct and primary,* operating upon the acts of *individuals, whether sanctioned by state legislation or not;* under the Fourteenth, as we have already shown, it must necessarily be, and can only be, corrective in its character, addressed to counteract and afford relief against state regulations or proceedings."

I participated in the decision of the *Civil Rights Cases,* but was not able to concur with my brethren in holding the act there involved to be beyond the power of Congress. But I stood with the court in the declaration that the Thirteenth Amendment not only established and decreed universal civil and political freedom throughout this land, but abolished the incidents or badges of slavery, among which, as the court declared, was the disability, based merely on race discrimination, to hold property, to make contracts, to have a standing in court, and to be a witness against a white person.

One of the important aspects in the present discussion of the *Civil Rights Cases,* is that the court there proceeded distinctly upon the ground that although the constitution and statutes of a State may not be repugnant to the Thirteenth Amendment, nevertheless, Congress, by legislation of a direct and primary character, may, in order to enforce the Amendment, reach and punish individuals whose acts are in hos-

tility to rights and privileges derived from or secured by or dependent upon that Amendment.

These views were explicitly referred to and reaffirmed in the recent case of *Clyatt.*v. *United States,* 197 U. S. 207. That was an indictment against a single individual for having unlawfully and knowingly returned, forcibly and against their will, two persons from Florida to Georgia, to be held in the latter State in a condition of peonage, in violation of the statutes of the United States, (Rev. Stat. 1900, 5526). A person arbitrarily or forcibly held against his will for the purpose of compelling him to render personal services in discharge of a debt, is in a condition of peonage. It was not claimed in that case that peonage was sanctioned by or could be maintained under the constitution or laws either of Florida or Georgia. The argument there on behalf of the accused was, in part, that the Thirteenth Amendment was directed solely against the States and their laws, and that its provisions could not be made applicable to individuals whose illegal conduct was not authorized, permitted or sanctioned by some act, resolution, order, regulation or usage of the State. That argument was rejected by every member of this court, and we all agreed that Congress had power, under the Thirteenth Amendment, not only to forbid the existence of peonage, but to make it an offense against the United States for any *person* to hold, arrest, return or cause to be held, arrested or returned, or who in any manner aided in the arrest or return of another person, to a condition of peonage. After quoting the above sentences from the opinion in the *Civil Rights Cases,* Mr. Justice Brewer, speaking for the court, said (p. 218): "Other authorities to the same effect might be cited. It is not open to doubt that Congress may enforce the Thirteenth Amendment by direct legislation, punishing the holding of a person in slavery or involuntary servitude, except as a punishment for crime. In the exercise of that power Congress has enacted these sections denouncing peonage, and punishing one who holds another in that condition of involuntary servitude.

This legislation is not limited to the Territories or other parts of the strictly National domain, but is operative in the States and wherever the sovereignty of the United States extends. We entertain no doubt of the validity of this legislation, or *its applicability to the case of any person holding another in a state of peonage, and this whether there be municipal ordinance or state law sanctioning such holding. It operates directly on every citizen of the republic, wherever his residence may be.*" The *Clyatt case* proceeded upon the ground that, although the Constitution and laws of the State might be in perfect harmony with the Thirteenth Amendment, yet the compulsory holding of one individual by another individual for the purpose of compelling the former by personal service to discharge his indebtedness to the latter created a condition of involuntary servitude or peonage, was in derogation of the freedom established by that Amendment, and, therefore, could be reached and punished by the Nation. Is it consistent with the principle upon which that case rests to say that an organized body of individuals who forcibly prevent free citizens, solely because of their race, from making a living in a legitimate way, do not infringe any right secured by the National Constitution, and may not be reached or punished by the Nation? One who is shut up by superior or overpowering force, constantly present and threatening, from earning his living in a lawful way of his own choosing, is as much in a condition of involuntary servitude as if he were forcibly held in a condition of peonage. In each case his will is enslaved, because illegally subjected, by a combination that he cannot resist, to the will of others in respect of matters which a freeman is entitled to control in such way as to him seems best. It would seem impossible, under former decisions, to sustain the view that a combination or conspiracy of individuals, albeit acting without the sanction of the State, may not be reached and punished by the United States, if the combination and conspiracy has for its object, by force, to prevent or burden the free exercise or enjoyment

of a right or privilege created or secured by the Constitution or laws of the United States.

The only way in which the present case can be taken out of section 5508 is to hold that a combination or conspiracy of individuals to prevent citizens of African descent, because of their race, from freely disposing of their labor by contract, does not infringe or violate any right or privilege secured by the Constitution or laws of the United States. But such a proposition, I submit, is inadmissible, if regard be had to former decisions. As we have seen, this court has held that the Thirteenth Amendment, by its own force, without the aid of legislation, not only conferred freedom upon every person (not legally held in custody for crime) within the jurisdiction of the United States, but the right and privilege of being free from the badges or incidents of slavery. And it has declared that one of the insuperable incidents of slavery, as it existed at the time of the adoption of the Thirteenth Amendment, was the disability of those in slavery to make contracts. It has also adjudged—no member of this court holding to the contrary—that any attempt to subject citizens to the incidents or badges of slavery could be made an offense against the United States. If the Thirteenth Amendment established freedom, and conferred, without the aid of legislation, the right to be free from the badges and incidents of slavery, and if the disability to make or enforce contracts for one's personal services was a badge of slavery, as it existed when the Thirteenth Amendment was adopted, how is it possible to say that the combination or conspiracy charged in the present indictment, and conclusively established by the verdict and judgment, was not in hostility to rights secured by the Constitution?

I have already said that the liberty protected by the Fourteenth Amendment against state action inconsistent with due process of law is neither more nor less than the freedom established by the Thirteenth Amendment. This, I think, cannot be doubted. In *Allgeyer* v. *Louisiana*, 165 U. S. 578, 589,

we said that such liberty "means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration; but the term is deemed to embrace the right of the citizen to be free in the enjoyment of *all his faculties; to be free to use them in all lawful ways; to live and work when he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to the carrying out to a successful conclusion the purposes above mentioned.*" All these rights, as this court adjudged in the *Allgeyer* case, are embraced in the liberty which the Fourteenth Amendment protects against hostile state action, when such state action is wanting in due process of law. They are rights essential in the freedom conferred by the Thirteenth Amendment. If, for instance, a person is prevented, because of his race, from living and working where and for whom he will, or from earning his livelihood by any lawful calling that he may elect to pursue, then he is hindered in the exercise of rights and privileges secured to freemen by the Constitution of the United States. If secured by the Constitution of the United States, then, unquestionably, rights of that class are embraced by such legislation as that found in section 5508.

The opinion of the court, it may be observed, does not, in words, adjudge section 5508 to be unconstitutional. But if its scope and effect are not wholly misapprehended by me, the court does adjudge that Congress cannot make it an offense against the United States for individuals to combine or conspire to prevent, even by force, citizens of African descent, solely because of their race, from earning a living. Such is the import and practical effect of the present decision, although the court has heretofore unanimously held that the right to earn one's living in all legal ways, and to make lawful contracts in reference thereto, is a vital point of the freedom *established by the Constitution,* and although it has been held, time and again, that Congress may, by appropriate

legislation, grant, protect and enforce *any* right, derived from, secured or created by, or dependent upon that instrument. These general principles, it is to be regretted, are now modified, so as to deny to millions of citizen-laborers of African descent, deriving their freedom from the Nation, the right to appeal for National protection against lawless combinations of individuals who seek, by force, and solely because of the race of such laborers, to deprive them of the freedom established by the Constitution of the United States, so far as that freedom involves the right of such citizens, without discrimination against them because of their race, to earn a living in all lawful ways, and to dispose of their labor by contract. I cannot assent to an interpretation of the Constitution which denies National protection to vast numbers of our people in respect of rights derived by them from the Nation. The interpretation now placed on the Thirteenth Amendment is, I think, entirely too narrow and is hostile to the freedom established by the supreme law of the land. It goes far towards neutralizing many declarations made as to the object of the recent Amendments of the Constitution, a common purpose of which, this court has said, was to secure to a people theretofore in servitude, the free enjoyment, without discrimination merely on account of their race, of the essential rights that appertain to American citizenship and to freedom. *United States* v. *Reese,* 92 U. S. 214, 217; *United States* v. *Cruikshank,* 92 U. S. 542, 555; *Ex parte Virginia,* 100 U. S. 339, 345; *Strauder* v. *West Virginia,* 100 U. S. 303, 306; *Neal* v. *Delaware,* 103 U. S. 370, 386; *Civil Rights Cases,* 109 U. S. 3, 23.

The objections urged to the view taken by the court are not met by the suggestion that this court may revise the final judgment of the state court, if it should deny to the complaining party a right secured by the Federal Constitution; for the revisory power of this court would be of no avail to the complaining party if it be true, as seems now to be adjudged, that a conspiracy to deprive colored citizens, solely because of

their race, of the right to earn a living in a lawful way, infringes no right secured to them by the Federal Constitution.

As the Nation has destroyed both slavery and involuntary servitude everywhere within the jurisdiction of the United States and invested Congress with-power, by appropriate legislation, to protect the freedom thus established against all the badges and incidents of slavery as it once existed; as the disability to make valid contracts for one's services was, as this court has said, an inseparable incident of the institution of slavery which the Thirteenth Amendment destroyed; and as a combination or conspiracy to prevent citizens of African descent, solely because of their race, from making and performing such contracts, is thus in hostility to the rights and privileges that inhere in the freedom established by that Amendment, I am of opinion that the case is within section 5508, and that the judgment should be affirmed.

For these reasons, I dissent from the opinion and judgment of the court.