Robert BOBILIN, Individually and as next friend of Steven Bobilin, et al., Plaintiffs,

v.

BOARD OF EDUCATION, STATE OF HAWAII, et al., Defendants.

Civ. No. 75–0205.

United States District Court, D. Hawaii.

Oct. 31, 1975.

Ronald Y. Amemiya, Atty. Gen., State of Hawaii, Randall Y. Iwase, Deputy Atty. Gen., Honolulu, Hawaii, for defendants.

## MEMORANDUM DECISION

WONG, District Judge.

The plaintiffs in this action seek to challenge the validity of regulations promulgated by the State Board of Education which, plaintiffs allege, require them to be subjected to cafeteria duty involutarily in violation of their constitutional rights. Accordingly, plaintiffs have moved this Court to convene a three-judge district court pursuant to 28 U.S.C. § 2281. Plaintiffs have additionally asserted that the provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* are applicable to the cafeteria duty they seek to challenge and thus that all students engaged in such duties are to be paid the minimum wages established by the Act.

Finally, plaintiffs urge that the State Board of Education, in promulgating regulations requiring mandatory cafeteria duty, has overreached and gone beyond the scope of the authority granted to it by Hawaii Rev.Stat. [hereinafter H.R.S.] § 296–12 which states that the Board of Education may adopt only such rules and regulations which are not contrary to law for carrying out the general scheme of education and for the transaction of its business.[1]

For the reasons which follow, this Court is compelled to dismiss each of plaintiffs' claims.

### Jurisdiction

Plaintiffs have called upon the jurisdiction of this Court by invoking 28 U.S. C. §§ 1343(3), 1343(4), and 1337.

### Statement of Facts

Children of school age have traditionally been required to perform cafeteria

Paul E. DiBianco, James A. Wagner, American Civil Liberties Union of Hawaii, Honolulu, Hawaii, for plaintiffs.

---

1. A fourth cause of action, that the Department of Education had not complied with State regulations concerning the handling and preparation of food, was dismissed by this Court as neither being a federal question nor a matter appropriately pendent to the plaintiffs' remaining claims.

duty throughout the State of Hawaii. At one time, school children were required to work in the cafeteria all day. At the present, however, as a result of a change in recent years, the imposition upon students is markedly less. Board of Education Rule 20.6 provides:

*Use of student help in the cafeteria.* As school service, pupils shall assist in the cafeteria. Not more than one full day of cafeteria duty shall be required of any pupil in any one month or more than a total of seven full days in one school year. Any exception must be approved by the district superintendent.

In practice, only students from grades 4 to 12 are affected.

The plaintiffs contend, however, that such cafeteria duty is unlawful because H.R.S. § 298-9 requires that all residents of the State of Hawaii who are under the age of eighteen attend a public school for and during such school year. Thus, plaintiffs argue that through the operation of this statute and Rule 20.6, *supra*, the plaintiffs are required to attend school and thus serve involuntarily in the school cafeterias.

Plaintiffs also point to Rule 21 which authorizes a suspension or dismissal of one day for a failure to perform cafeteria duties.[2] Plaintiffs note that a failure to perform cafeteria duty has resulted in

suspension for one day in each instance that any of them has refused to serve. In their prayer, consequently, they request that this Court order all records of suspension for failure to comply with Rule 20.6 to be removed from their files.

*Three-Judge Court*

This Court deals first with plaintiffs' request for a three-judge federal district court pursuant to 28 U.S.C. § 2281. The Supreme Court has held in *Idlewilde Bon Voyage Liquor Corp. v. Epstein,* 370 U.S. 713, 715, 82 S.Ct. 1294, 1296, 8 L.Ed.2d 794 (1962):

When an application for a statutory three-judge court is addressed to a district court, the court's inquiry is appropriately limited to determining whether the constitutional question raised is substantial, whether the complaint at least formally alleges a basis for equitable relief, and whether the case presented otherwise comes within the requirements of the three-judge statute.

■ It is clear that plaintiffs' complaint "at least formally alleges a basis for equitable relief." It is arguable whether all other requirements of the three-judge statute have been met,[3] but we need not reach that issue since we find that plaintiffs' complaint has failed to present a substantial federal question.[4]

2.
"Rule 21. *Relating to Student Suspension and/or Dismissal from School.*
21.1 *General Rule.* A student may be suspended, and/or dismissed from school with approval of the district superintendent, when his continued enrollment becomes detrimental to the morals or discipline of the school.
. . . . ."
Although the rule sets no limits, the defendants state that a failure to serve "may lead to . . . suspension for one school day." Motion for Summary Judgment, Memorandum of Points and Authorities at 2.
Whether the standards of due process have been met with respect to the instances in which the plaintiffs were suspended for failing to serve in the cafeteria is an issue which has neither been raised nor briefed by the parties. This Court's decision today, however,

is premised upon the assumption that the requirements of *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), as applicable, have been fully met by the State. *See also Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

3. Since mandatory cafeteria duty reaches only those from grades 4 through 12, and since this Court is aware that cafeteria duty is not mandatory at every school in the State system, but is discretionary in at least some of them, it may be that the regulations in question are not of statewide application as required by *Board of Regents of the University of Texas System v. New Left Education Project,* 404 U.S. 541, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972).

4. This Court also avoids questions of abstention although under the reasoning of *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39

As the United States Supreme Court noted in *Goosby v. Osser,* 409 U.S. 512, 518, 93 S.Ct. 854, 858, 35 L.Ed.2d 36 (1972): "Title 28 U.S.C. § 2281 does not require the convening of a three-judge court when the constitutional attack upon the state statutes is insubstantial." The lack of substantiality alone is enough to warrant dismissal of the claim.[5] In determining the substantiality of the issue, this Court is not unmindful that: "A claim is insubstantial only if ' "its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy." ' " (Citations omitted.) *Goosby, supra,* at 518, 93 S.Ct. at 859.

The Court, moreover, confines itself to the allegations of the complaint in making its determination. *Ex parte Poresky,* 290 U.S. 30, 32, 54 S.Ct. 3, 78 L.Ed. 152 (1933); *Goosby v. Osser, supra,* at 521 n. 7. Even though this Court also accepts at least the *undisputed* allegations of the bill of complaint as true, *Boddie v. Connecticut,* 401 U.S. 371, 373, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), it is clear to this Court that upon a review of the decisions of the Supreme Court, and

other courts of competent jurisdiction, there is no substantial federal question alleged in plaintiffs' complaint.

Initially, this Court notes that plaintiffs have alleged that there is no educational purpose to the cafeteria duty. This allegation has been denied in defendants' answer as well as in their various memoranda.

Assuming, however, that plaintiffs are correct and that such duties are not educational but instead are simply services performed for the public welfare, then plaintiffs argue that a substantial claim of involuntary servitude has been made out, thus requiring the convening of a statutory three-judge district court.

Plaintiffs concede, at least implicitly, that characterizing cafeteria duties as "education" would undercut their assertion of involuntary servitude in violation of the Thirteenth Amendment of the United States Constitution. Were it not for the fact that this Court finds persuasive legal theories, including those advanced by the State, in support of non-substantiality, it might find itself constrained to take judicial notice of the educational values of cafeteria duties in the public schools.[6]

L.Ed.2d 577 (1974), it believes it may abstain if there were a federal question presented here since the pendent state statutory claim would potentially be dispositive of the entire action.

5. As the Supreme Court stated in *Gonzalez v. Automatic Employees Credit Union,* 419 U.S. 90, 96–97 n. 14, 95 S.Ct. 289, 42 L.Ed. 2d 249 (1974): "But we have always recognized a single judge's power to dismiss a complaint for want of general subject-matter jurisdiction, without inquiry into the additional requisites specified in §§ 2281 and 2282. [Citations omitted.]"

6. At page 5 of Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment and/or Motion to Dismiss (hereinafter Memorandum in Opposition), plaintiffs state: "Thus the issue in the present case is what the primary purpose of the mandatory lunchroom duty is. Plaintiffs contend that the primary function is to save money for the Department of Education and any 'learning experience' derived is minimal and ancillary." However, since plaintiffs so

emphatically rely upon *Jobson v. Henne,* 355 F.2d 129 (2d Cir. 1966), this Court will treat the logic of their position as resting solely upon the express language of *Jobson* and, in particular, footnote 3 of that case. *See also* Complaint at 4.

Plaintiffs emphasize the following language in the footnote: "[I]t would seem that the Thirteenth Amendment may be violated if a mental institution requires inmates to perform chores which have no therapeutic purpose or are not personally related, but are required to be performed solely in order to . . . . ."

On the basis of the above language, assuming that both parties agree that cafeteria assist in the defraying of institutional costs duty has educational value, it is apparent that both parties would also agree that involuntary servitude has not been made out. Assuming no agreement, as is the case here, the State has nevertheless proffered in its answer, as well as in its memoranda on the substantiality issue, responses and arguments that indicate the presence of an educational plan which

The viability and reasonableness of such a course will remain unpursued here, however, since it is manifest to this Court that previous decisions of the Supreme Court foreclose any inference that plaintiffs have, through their complaint, alleged a substantial federal question.

In reaching this decision, this Court has been guided by not only the decisions of the Supreme Court cited by the parties but also by other decisions not touched upon by the parties in their memoranda or oral arguments. For ease of discussion, however, this Court turns initially to the decisions cited by the plaintiffs to support their allegations that (1) the labor performed was involuntary; and (2) the labor performed served no compelling state interest; i. e., it is not therapeutic but is only to assist in defraying institutional expenses.

*Jobson v. Henne*, 355 F.2d 129, 132 (2d Cir. 1966), involved patients in a mental institution who, according to affidavits, were required to perform housekeeping duties in the school's boiler house eight hours a night, six nights a week, while working eight hours a day at assigned jobs in the village of Newark. The U. S. Court of Appeals for the Second Circuit, speaking through Judge Waterman, *inter alia,* held that: "As we cannot say that any such work program would not go beyond the bounds permitted by the Thirteenth Amendment, the complaint states a claim under § 1983."

In a footnote, *id.* at 132 n. 3, cited by both parties in the instant case, Judge Waterman notes in *dictum:*

> Therefore, whether an institution's required program in any given case constitutes involuntary servitude would seem to depend on the nature of the tasks that are required of the inmate If a court can conclude that the chores are reasonably related to a therapeutic

program or to the inmate's personal needs, the fact that the performance of the chores also assists in defraying the operating costs of the institution should not constitute involuntary servitude, even if inmates are required to engage in this activity. On the other hand, it would seem that the Thirteenth Amendment may be violated if a mental institution requires inmates to perform chores which have no therapeutic purpose or are not personally related, but are required to be performed solely in order to assist in the defraying of institutional costs, and it would appear that this would be so even if the inmates were compensated for their labor, for the mere payment of a compensation, unless the receipt of the compensation induces consent to the performance of the work, cannot serve to justify forced labor. [Citation omitted.]

Plaintiffs, relying upon the *Jobson dictum,* assert that there is absolutely no educational value involved in cafeteria duty.

After reviewing the decisions of the Supreme Court in the Thirteenth Amendment area, this Court believes that for reasons developed *infra,* the portion of the *Jobson dictum* which plaintiffs rely upon, while perhaps appropriate in the context of a mental institution, if accepted in the school cafeteria-duty context here at issue, would result in too broad a reading of the Thirteenth Amendment's proscription against involuntary servitude.

The second case presented by plainiffs in their complaint is *Weidenfeller v. Kidulis,* 380 F.Supp. 445 (E.D.Wis.1974) which also involved a mental institution, although in that case it was a private one. In *Weidenfeller,* it was alleged that two mentally handicapped persons were

---

legitimizes the educational nature and quality of the cafeteria duty.

Were this the controlling issue, this Court might feel itself compelled to take judicial notice of the educational value of cafeteria duty to avoid delving into the merits of the State's characterization of the duties and to deny

plaintiffs' request for a three-judge court in the interests of judicial economy. *See* Boskey and Gressman, *Recent Reforms in the Federal Judicial Structure—Three-Judge District Courts and Appellate Review,* 67 F.R.D. 135, 137–43 (1975).

forced to perform productive labor with some compensation. In denying the institution's motion to dismiss, the court observed, *id.* at 450:

It has been held that forced labor of certain individuals, including the mentally disabled, amounts to involuntary servitude and therefore is violative of the thirteenth amendment. (Citation omitted.)[7]

In so ruling, the court relied upon the *Jobson* dichotomy of therapeutic and non-therapeutic work. Since this Court has stated that it finds that rationale unpersuasive and inapplicable in the context of the instant case, *Weidenfeller* must go the way of *Jobson*.

*Downs v. Department of Public Welfare*, 368 F.Supp. 454 (E.D.Pa.1973), also relied upon by plaintiffs, similarly involved a mental institution against which suit was brought to end the alleged "forced labor" of patients. The district court held that a basis for jurisdiction founded upon allegations against individual state officials had been made. The court said with regard to its ruling:

The *Jobson* and *Wyatt*[8] cases are the most apposite cases which have come to this Court's attention. We do not adopt the precise position of either of them at this stage in the litigation but only rely upon them as support for our conclusion that the Thirteenth Amendment has applicability in the mental health institution context and that the plaintiffs may prove sufficient facts pursuant to the allegations of their complaint to prove a violation of the Thirteenth Amendment. (*Id.* at 465.)

In view of the above, *Downs* is inapposite to a decision in the instant case. Its language speaks merely to the applicability of the Thirteenth Amendment in a mental institution context dissimilar to the present one.

A mental institution, this Court believes, is more likely to be the source of abuse in the Thirteenth Amendment context because of the nature of the custodial situation. Patients more often than not are institutionalized and forgotten with little, if any, voice given them in improving their living conditions. Because of the potential for abuse, the courts have been less hesitant about structuring judicial remedies in this context. The public schools, however, are open institutions which are populated by children who remain for only a portion of the whole day and whose interests are assiduously protected by their parents and by carefully-drawn regulations which enumerate and protect their rights. Consequently, this Court should be wary of imposing its influence into the operation of a state-wide school system.

In response to defendants' argument (here phrased in plaintiffs' words), Plaintiffs' Memorandum in Opposition at 2, ". . . that the purpose of the Thirteenth Amendment was to proscribe involuntary servitude involving Mexicans, Chinese Coolies and Africans," the plaintiffs' reply that they

have read the Thirteenth Amendment very carefully and nowhere noted its restriction to any particular race or ethnic group.

---

**7.** The Court nevertheless recognized: "It, however, has never been held that the mere subjecting of the mentally retarded to any form of work program is *per se* unconstitutional under the thirteenth amendment." *Id.* at 450.

**8.** *Wyatt v. Stickney*, 344 F.Supp. 373 (M.D. Ala.1972), involved a class action on behalf of patients involuntarily confined for mental treatment purposes in an Alabama mental institution. The court entered an order providing for implementation of medical and constitutional minimums in the treatment of patients. It reserved ruling upon a request for the appointment of a master and an advisory committee to oversee the implementation of the standards, noting: "Federal courts are reluctant to assume control of any organization, but especially one operated by a state." *Id.* at 377. Nevertheless, the court placed the defendants on notice that it would take action should they fail to comply satisfactorily with the court's order. *Id.* at 374–75.

The purpose of the Thirteenth Amendment is to proscribe conditions of enforced compulsory service of one person to another. *Hodges v. United States,* . . . *Beltran v. Cohen,* . . . . The very essence of the Thirteenth Amendment is a prohibition against forcing one person to labor against his will for the benefit of another person.

This Court deals first with *Hodges v. United States,* 203 U.S. 1, 27 S.Ct. 6, 51 L.Ed. 65 (1906), in which a number of defendants sought to overturn indictments brought against themselves and others in the United States District Court on the charge that they unlawfully conspired to oppress and threaten a number of citizens of the United States of African descent from freely exercising their rights to contract and dispose of their labor and services without discrimination, illegal interference, or violence against them because of their race or color.

The Supreme Court held that the District Court had no jurisdiction over any of the wrongs alleged in the indictment. The Court reasoned that: "[I]t was not the intent of the [Thirteenth] Amendment to denounce every act done to an individual which was wrong if done to a free man, and yet justified in a condition of slavery . . . ." *Id.* at 19, 27 S.Ct. at 9.

The Court also noted that Congress through the Thirteenth Amendment gave those of African descent ". . . citizenship, doubtless believing that thereby in the long run their best interests would be subserved, they taking their chances with other citizens in the states where they should make their homes." *Id.* at 20, 27 S.Ct. at 10.

With regard to the meaning of the Thirteenth Amendment, the Court stated:

> The meaning of this is as clear as language can make it. The things denounced are slavery and involuntary servitude, and Congress is given power to enforce that denunciation. All

understand by these terms a condition of enforced compulsory service of one to another. While the inciting cause of the Amendment was the emancipation of the colored race, yet it is not an attempt to commit that race to the care of the nation. It is the denunciation of a condition, and not a declaration in favor of a particular people. It reaches every race and every individual, and if in any respect it commits one race to the nation it commits every race and every individual thereof. Slavery or involuntary servitude of the Chinese, of the Italian, of the Anglo-Saxon, are as much within its compass as slavery or involuntary servitude of the African. (*Id.* at 16–17, 27 S.Ct. at 8.)

▬ Plaintiffs assert, and this Court agrees, that *Hodges* teaches that the elimination of African slavery, while the prime motivating cause of the Thirteenth Amendment, nevertheless does not demark the outer limits of that Amendment's application. *Cf. The Peonage Cases,* 123 F. 671 (M.D.Ala. 1903). Going beyond this, however, this Court believes that *Hodges* also teaches that the courts should be wary of indiscriminately denouncing every act of apparent servitude imposed upon free men as being violative of the Thirteenth Amendment without a careful inquiry into the nature of the injury alleged.

In *Beltran v. Cohen,* 303 F.Supp. 889 (N.D.Cal.1969), the second case relied upon by plaintiffs to illustrate the purpose of the Thirteenth Amendment, a California federal district court held that a law authorizing summary levy upon wages to collect unpaid federal income taxes did not deny the plaintiff due process, was not involuntary servitude and, consequently, a complaint challenging the constitutional validity of the statute did not present a substantial federal question requiring the convening of a three-judge court.

The *Beltran* court defined the "essence of slavery or involuntary servitude" as being a condition in which "the

**1102**

worker must labor against his will for the benefit of another." It noted that the plaintiff was not being compelled to work against her will for the benefit of the government because she may choose not to work. Moreover, the *Beltran* court noted even if the tax laws by their operation imposed "a kind of servitude," it had been held that they did not impose "the kind of involuntary servitude referred to in the Thirteenth Amendment." *Id.* at 893.

While this Court would question whether *Beltran's* suggested alternative of refusing to work as a means of avoiding the payment of taxes provides any viable choice at all, it nevertheless finds itself fully concurring with *Beltran's* necessary holding that servitudes imposed by law do not necessarily run afoul of the Thirteenth Amendment simply because they are required by law.

This concurrence with *Beltran* is bottomed sturdily upon the previous decisions of the Supreme Court of the United States in this area. This Court turns first to the Supreme Court decisions under the peonage statute, enacted to further implement the aims of the Thirteenth Amendment, which were reviewed in *Pollock v. Williams,* 322 U.S. 4, 64 S.Ct. 792, 88 L.Ed. 1095 (1944). These decisions involved convictions under state laws making it a crime for servants owing debts or for other types of debtors to leave their employment until their debts had been paid.

Justice Jackson, writing for the Court, used the metaphor of "sword" and "shield" to characterize actions brought under the peonage statute. In *Clyatt v. United States,* 197 U.S. 207, 25 S.Ct. 429, 49 L.Ed. 726 (1905), for example, the statute was used as a "sword" and an employer was convicted for violating it. The Court there said of peonage:

> It may be defined as a status or condition of compulsory service, based upon the indebtedness of the peon to the master. The *basal fact is indebtedness.* *(Id.* at 215, 25 S.Ct. at 430.) (Emphasis added.)

In *Pollock,* in contrast, the Court used the peonage statute as a "shield" against the enforcement of the state's debtor statute.

As in *Pollock,* the alleged involuntary servitude in the present case involves service required by law. However, the "basal fact" of peonage is "indebtedness" and to that extent *Pollock* is not useful to this Court's present inquiry. Nevertheless, this Court finds Justice Jackson's comments about the Thirteenth Amendment of value.

> The undoubted aim of the Thirteenth Amendment as implemented by the Antipeonage Act was not merely to end slavery but to maintain a system of completely free and voluntary labor throughout the United States.

Nevertheless:

> Forced labor in some special circumstances may be consistent with the general basic system of free labor. (322 U.S. at 17, 64 S.Ct. at 799.)

Mr. Justice Jackson found support for this proposition in *Butler v. Perry,* 240 U.S. 328, 36 S.Ct. 258, 60 L.Ed. 672 (1916), in which a Florida statute required "[e]very able-bodied male person over the age of twenty-one years, and under the age of forty-five years" to work "on the roads and bridges of the several counties for six days of not less than ten hours each in a year when summoned so to do" or to pay a sum of money for a road and bridge fund or to provide an able-bodied substitute. *Laws of Florida,* § 10.

In ruling that one who failed to comply with the state statute could be criminally convicted for misdemeanor and sentenced to 30 days or fined $50, *Laws of Florida,* § 12, the Court explained:

> In view of ancient usage and unanimity of judicial opinion, it must be taken as settled that, unless restrained by some constitutional limitation, a state has inherent power to require every able-bodied man within its jurisdiction to labor for a reasonable time on public roads near his residence

without direct compensation. This is a part of the *duty which he owes to the public.* (Emphasis added.) 240 U.S. at 330, 36 S.Ct. at 258.)

In so ruling, the *Butler* court gave its imprimatur to uncompensated highway work as a "special circumstance" which allowed the state to impose criminal sanctions for a refusal to comply with the statutory provisions.

Compulsory military service has also been upheld by the Supreme Court in the *Selective Draft Law Cases*, 254 U.S. 366, 390, 38 S.Ct. 159, 165, 62 L.Ed. 349 (1918), where the Court said:

Finally, as we are unable to conceive upon what theory the exaction by government from the citizen of the performance of his supreme and noble duty of contributing to the defense of the rights and honor of the nation as the result of a war declared by the great representative body of the people can be said to be the imposition of involuntary servitude in violation of the prohibitions of the Thirteenth Amendment, we are constrained to the conclusion that the contention to that effect is refuted by its mere statement.

In an even stronger statement, the Court in *Jacobson v. Massachusetts*, 197 U.S. 11, 29, 25 S.Ct. 358, 362, 49 L.Ed. 643 (1905), declared that despite a person's constitutional rights:

[H]e may be compelled, by force if need be, against his will and without regard to his personal wishes or his pecuniary interests, or even his religious or political convictions, to take his place in the ranks of the army of his country and risk the chance of being shot down in its defense.

Even those who legitimately seek to avoid combatant duty can be compelled to work involuntarily. In *Heflin v. San-*

*ford*, 142 F.2d 798 (5th Cir. 1944), the appellant was convicted for failing to report to a designated camp as a conscientious objector and was imprisoned. In denying his motion for habeas corpus which was based on the ground that his conviction was unconstitutional, the court noted:

The answer to appellant's complaint lies in the broad principle that the Thirteenth Amendment has no application to a call for service made by one's government according to law to meet a public need, just as a call for money in such a case is taxation and not confiscation of property. (*Id.* at 799.)

In concluding, the court again reiterated the theme of public need:

The Thirteenth Amendment abolished slavery and involuntary servitude, except as a punishment for crime, but was never intended to limit the war powers of government or its right *to exact by law public service from all to meet the public need.* (Emphasis added.) (*Id.* at 800.)

*See also Kramer v. United States*, 147 F. 2d 756 (6th Cir. 1945), *cert. denied*, 324 U.S. 878, 65 S.Ct. 1026, 89 L.Ed. 1429 (1945); *United States v. Anderson*, 467 F.2d 210 (9th Cir. 1972), *cert. denied*, 410 U.S. 990, 93 S.Ct. 1514, 36 L.Ed.2d 189 (1972).

■ At a minimum, the cases cited above indicate that there are certain servitudes which because of their historical circumstance are excepted from the prohibitions of the Thirteenth Amendment, or because of the public need involved are considered to be justified "special circumstances" in the public interest.

Defendants here argue that cafeteria duty falls within a historical exception [9]

9. An example of a historical exception can be found in *Robertson v. Baldwin*, 165 U.S. 275, 17 S.Ct. 326, 41 L.Ed. 715 (1897). Petitioners in *Robertson* were seamen who had signed shipping articles but who, having become dissatisfied with their employment, left their vessels. They were subsequently arrested for refusing to obey the orders of the master of their ship pursuant to a federal statute and were returned to work. The Supreme Court ruled that the statutes in issue were not in conflict with the Thirteenth Amendment insofar as they required seamen to carry out contracts in their shipping articles. The Court observed that the contract of a sailor has always been treated as an

—that of education. Plaintiffs allege, however, that no educational value is involved.

■ Taking plaintiffs' allegation as true, although it is disputed in defendants' answer, this Court, nevertheless, is unable to find that cafeteria duty falls within the constraints of the Thirteenth Amendment. Assuming, as both plaintiffs and defendants do, that the cafeteria duty allows the State to reap a financial benefit, that is, the obviation of any necessity to hire, at great expense, professional employees to perform the school-related housekeeping duties in the stead of the students, it is clear that both parties must necessarily agree that the public,[10] and not private,[11] interest and benefit are being served.

On the basis of the balances that the Supreme Court has struck in the past—its weighing the duties and impositions mandated by law against the public need served—it is manifest to this Court that the cafeteria duty here imposed by State regulations do not fall within the proscription of the Thirteenth Amendment.

■ Assuming that plaintiffs' allegations are true, that they are required to serve in the school cafeteria without compensation and against their wills,[12] it is nevertheless this Court's firm conclusion, on the basis of the balances struck by the Supreme Court in the past, that the imposition is more than outweighed by the conceded public benefit involved.

The imposition itself, in actual terms, is minimal in comparison with imposi-

"exceptional" circumstance involving the surrender of personal liberty during the life of the contract. The Court stated: "It is clear, however, that the amendment was not intended to introduce any novel doctrine with respect to certain descriptions of service which have always been treated as exceptional, such as military and naval enlistments, or to disturb the right of parents and guardians to the custody of their minor children or wards. . . . To say that persons engaged in a public service are not within the amendment is to admit that there are exceptions to its general language, and the further question is at once presented, where shall the line be drawn? We know of no better answer to make than to say that services which have from time immemorial been treated as exceptional shall not be regarded as within its purview." *Id.* at 282, 17 S.Ct. at 329.

10. With regard to serving the public interest, this Court notes that the schools have, in other contexts, increasingly become instruments of national and local social policy, and not merely founts of education. School integration to achieve racial balance, a federally-assisted school lunch program, local school programs to help assimilate immigrants into the mainstream of American life, and other similar programs often legitimately detract from the traditional educational services offered by the schools. That they do so often is a product of the desires of the citizenry expressed through the actions of their elected representatives. The courts have intervened in school operations and dictated school policies only where the constitutional rights involved were so vital and their abridgment so

flagrant as to prohibit the courts from following a course of non-intervention. Such is not the case here.

11. Even where a *private* interest is involved, the Court has held that there can be exceptions to the Thirteenth Amendment. In *Robertson, supra* note 9, for example, after recognizing that the protective nature of the amendment "makes no distinction between a public and a private service," *id.*, in affording protection, the Court nevertheless held that upholding a private contract between a seaman and his ship master was an interest which transported the involuntary service which resulted well beyond the sheltering haven of the Thirteenth Amendment.

12. Since this Court does not rule on the merits, it cannot delve into the issue of involuntariness. It seems to this Court, however, that involuntariness in the present context turns upon the question of whether there exists a viable alternative to serving either through enrollment in nonpublic schools or through a refusal to serve and thus subjecting oneself to possible suspension or dismissal by school officials.

The potential sanctions imposable may be not so severe, not so certain, or not so onerous as to trigger the Thirteenth Amendment's protection against involuntary servitude. It is true that a decision to refuse to serve may have economic or other social costs above and beyond that of acquiescing and serving. But such costs, because of the societal latitude and freedom of action and choice they afford, are a part and parcel of the fundamental structure of our society, and undergird its most cherished and basic values.

tions allowed in the cases discussed *supra*. Clearly, a requirement of potentially no more than one day a month, or seven full days in one school year, a requirement which operates in reality to require a maximum of three hours per day, and which averages 60 to 90 minutes for most students,[13] does not rise to the magnitude of involuntariness as dying unwillingly for one's country, serving with little or no pay as a conscientious objector in a labor camp during wartime, or working on the highways without compensation. All of these impositions not only involve more strenuous and difficult duties, but also involve criminal sanctions for the failure to comply.

In the present case, the sanction involved is an administrative one, suspension of one day from classes. Even the inevitability of suspension is subject to doubt in view of the defendants' denial that a failure to assist in cafeteria duty automatically leads to suspension from school under Rule 21. Defendants' Answer and Certificate of Service at 1.

While it is true that there is no war or national emergency in the present circumstances, it must also be conceded that neither are the duties here involved of the arduous magnitude required by more momentous public necessities.

Undoubtedly, notwithstanding this Court's explanation of what it believes the law to be, plaintiffs will still be unsatisfied with what they believe to be a personally disagreeable situation. This Court can only observe that if such a situation is personally disagreeable, the remedy lies with the legislature of this State. Indeed, it may be that the vast majority of the electorate believes that required cafeteria duty, even assuming its legality and educational value, is as plaintiffs believe, an anachronism best relegated to the past. If this be the case, then plaintiffs' recourse lies with their elected representatives.

This Court reiterates that mandatory cafeteria duty in the public schools here in question does not run afoul of the Thirteenth Amendment because the Supreme Court's decisions in the past foreclose allegations of involuntary servitude as being so unmeritorious as not to present any substantial federal question requiring the convening of a three-judge court.

### Fair Labor Standards Act

Plaintiffs allege that "minor Plaintiffs have either served in the cafeteria without compensation contrary to the Fair Labor Standards Act or have refused service and have been suspended from school as punishment." Complaint for Declaratory Judgment, Injunctive Relief and Damages at 4.

Specifically, they allege that "[t]he Fair Labor Standards Act (29 U.S.C. § 201 *et seq.*) establishes the minimum wage an employer must pay to his employees. § 203(s)(4) specifically provides that employees of public secondary schools are included under the Act." *Id.* at 5.

This Court assumes that plaintiffs are asserting that the operative language of the Fair Labor Standards Act (hereinafter FLSA) that they refer to with regard to minimum wages is found in § 206(a) which states in pertinent part:

(a) Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates: . . ..

Section 203(s)(4), concerning employees of public secondary schools, is found in the section dealing with definitions used in the chapter and states:

13. Affidavit of Teichiro Hirata attached to Defendants' Motion for Summary Judgment. Although this Court finds the actual time spent by students in cafeteria duty of interest, this information does not alter or affect in any way this Court's holding that plaintiffs have not presented a substantial federal question.

(s) "Enterprise engaged in commerce or in the production of goods for commerce" means an enterprise which has employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and which—

. . . .

(4) is engaged in the operation of . . . a preschool, elementary or secondary school, or an institution of higher education (regardless of whether or not such . . . school is public or private or operated for profit or not for profit) ; . . . .

The foregoing language, plaintiffs argue, makes applicable the provisions of the FLSA to the public secondary schools. They also cite 29 U.S.C. § 214 (d) in support of their argument.[14] This section, they argue, "states that elementary and secondary school students will be permitted to work in their respective schools only under such orders or under such regulations as the Secretary of Labor may promulgate." Plaintiffs' Memorandum in Opposition at 8.

On the basis of the statutory language cited, plaintiffs urge that secondary school children are to be governed by the standards of the FLSA because they are employed by the school system when they perform cafeteria duty.

 The crucial question, it seems to this Court, is whether the students who perform cafeteria duty are "employed" and whether the State Department of Education is an "employer" within the meaning of the Act. Thus, this Court initially turns to an exploration of the question of whether an employer-employee relationship, as defined by the Act,

exists between those students who perform cafeteria duty and the State Department of Education.

Section 203(d) of the FLSA defines "employer" as:

[A]ny person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency . . . .

The term "employee" is also defined in Section 203(e)(1) which states: "[T]he term 'employee' means any individual employed by an employer."

Having been led through a somewhat circuitous course, this Court finds it necessary to turn to a consideration of the term "employ" which is defined in Section 203(g) as including "to suffer or permit to work."

As the Supreme Court stated in *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152, 67 S.Ct. 639, 641, 91 L.Ed. 809 (1947):

The definition "suffer or permit to work" was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another. Otherwise, all students would be employees of the school or college they attended, and as such entitled to receive minimum wages. . . . The Act's purpose as to wages was to insure that every person whose employment contemplated compensation should not be compelled to sell his services for less than the prescribed minimum wage.

The question before this Court is whether the activity—public school cafeteria duty—at issue in this case falls within the exception which *Walling* carves out.

---

14. Section 214(d) states more specifically: "The Secretary may by regulation or order provide that sections 206 and 207 of this title shall not apply with respect to the employment by any elementary or secondary school of its students if such employment constitutes, as determined under regulations prescribed by the Secretary, an integral part of the regular education program provided by such school and such employment is in accordance with applicable child labor laws." Since this Court defines cafeteria duty as not being "employment" under the FLSA, this provision does not come into operation in the present case.

Plaintiffs at the outset of their complaint set out the test enunciated by *Souder v. Brennan,* 367 F.Supp. 808 (D.D.C.1973). Souder involved a patient in a mental institution and the court there stated:

> Economic reality is the test of employment and the reality is that many of the patient-workers perform work for which they are in no way handicapped and from which the institution derives full economic benefit. So long as the institution derives any consequential economic benefit the economic reality test would indicate an employment relationship rather than mere therapeutic exercise. To hold otherwise would be to make therapy the sole justification for thousands of positions as dishwashers, kitchen helpers, messengers and the like. (*Id.* at 813.)

The defendants, citing a case of their own—*Sims v. Parke Davis & Co.,* 344 F. Supp. 774, 786 (E.D.Mich.1971), *aff'd* 453 F.2d 1259 (6th Cir. 1971), *cert. denied* 405 U.S. 978, 92 S.Ct. 1196, 31 L.Ed. 2d 254 (1972)—would qualify the economic reality test by considering the entire fabric of the plaintiffs' relationship to the defendants.[15] By doing so, defendants argue, the Court must reach the conclusion that there is no employment relationship existing.

This Court is inclined to the logic of defendants' arguments for several reasons. First, the context of the decision cited by the plaintiffs is that of a mental institution, not a public secondary school.[16] The disparity in treatment in a mental institution from a public school is sufficient to distinguish the economic reality test enunciated in *Souder* from that of the present case.[17]

Second, it would be absurd for this Court to rule that any educational activity would be placed within the requirements of the FLSA simply because there may be an economic benefit to the insti-

---

15. This Court notes that the "economic reality" test expounded by defendants is solidly founded in a long line of judicial precedents. In *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730, 67 S.Ct. 1473, 1477, 91 L.Ed. 1772 (1947), the Supreme Court stated with regard to the employer-employee relationship: "We think, however, that the determination of the relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity." In *United States v. Silk,* 331 U.S. 704, 713, 67 S.Ct. 1463, 1468, 91 L.Ed. 1757 (1947), the Court had further elucidated: "The word 'employee,' we said, was not there used as a word of art, and its content in its context was a federal problem to be construed ' "in light of the mischief to be corrected and the end to be attained." ' We concluded that, since that end was the elimination of labor disputes and industrial strife, 'employees' included workers who were such as a matter of *economic reality.* . . . We approved the statement of the National Labor Relations Board that ' "the primary consideration in the determination of the applicability of the statutory definition is whether effectuation of the declared policy and purposes of the Act comprehend securing to the individual the rights guaranteed and protection afforded by the Act." ' [Citation omitted.]" (Emphasis added.)

The declared policy of the FLSA is stated in § 202(a). The evils to be eliminated are "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers" which are perpetuated and spread through the channels of interstate commerce and which burden the "free flow of goods in commerce," constitute "unfair competition," lead to "labor disputes," and interfere with the "orderly and fair marketing of goods in commerce."

This Court finds it difficult to reconcile the evils alleged by plaintiffs with the stated declaration of policy underlying the FLSA. Consequently, this Court views its characterization of cafeteria service as not being "employment" as entirely consistent with the congressional policies sought to be implemented.

16. *See* pages 1098–1101 of the text of this opinion.

17. Indeed, the *Souder* court was construing a portion of the section of the statute not at issue here: "The words of the statute here in question say simply that 'employ' means 'to suffer or permit to work', that 'employer' specifically includes 'a hospital, institution, or school' for the *residential care* of the mentally ill." (Emphasis added.) 367 F. Supp. at 813. The portion of the section of the statute at issue here is quoted at page 1105 of the text of this opinion.

tution involved. This would throw the baby out with the bath water. The full implication of the Supreme Court's statement in *Walling* that "[o]therwise, all students would be employees of the school or college they attended, and as such entitled to receive minimum wages," 330 U.S. at 152, 67 S.Ct. at 641, would be met full force.

Moreover, while "not all forms of human experience," *see* Defendants' Motion for Summary Judgment, Memorandum of Points and Authorities at 10, are educational, it is clear that many "services" performed by students do serve "educational" purposes. For example, this Court notes the widespread and common practice of requiring elementary school children to perform small tasks such as erasing blackboards, putting their chairs on their desks after school, and serving as crosswalk monitors. These experiences teach not only neatness and responsibility but also civic attitudes fundamental in a collective society where a citizen is often called upon to "do his share" without economic compensation.

Such small tasks admittedly do have economic value to the state in that they save the cost of hiring adults to perform these same tasks. Nevertheless, looking to the "economic reality" of the entire situation, it is obvious to this Court that such economically valuable activities could not reasonably be considered employment under the FLSA, which would require the payment of minimum wages to students.

In the same way, the argument that cafeteria service is employment because of its economic value to the State is not well founded in the present circumstanc-es, especially when the State's assertion that such duties serve educational goals has not been demonstrated to be inarguably frivolous by the plaintiffs. Hence, the nature of the service performed by plaintiffs is not "employment" within the meaning of the FLSA.

Plaintiffs argue that the FLSA has undergone substantial revision since the date of the *Walling* decision and urge this Court to distinguish the present case on a number of grounds. With respect to plaintiffs' first point, the validity of the *Walling* holding has recently been upheld by the United States Court of Appeals for the Ninth Circuit in *Wirtz v. San Francisco and Oakland Helicopter Airline, Inc.,* 370 F.2d 328 (9th Cir. 1966).[18]

The court there in a *per curiam* decision stated:

> We think that the court correctly applied the principle stated by the Supreme Court in *Walling v. Portland Terminal Co.* [citation omitted].
>
> > "The definition 'suffer or permit to work' was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another."
>
> Students in a school situation like the present one, because they are required to attend in accord with State law, may not believe themselves to be working for their own advantage. But it is not within their province to decide the educational merits of their activities at the school. Rather, in our system, the determination of the educational value of the course of

---

18. *See also, e. g., Hodgson v. Ellis Transp. Co.,* 456 F.2d 937 (9th Cir. 1972), where *Walling* was cited to support an expansive definition of employment, and *Ballou v. General Electric Co.,* 433 F.2d 109, 111–12 (1st Cir. 1970), where the *Walling* holding was cited as viable law to be construed with more recent labor legislation. (Indeed, in *Ballou* it was held that apprentices who were required, subject to dismissal, by their labor contract to prepare for and attend classes not directly related to their on-the-job training need not be compensated for such classwork under the FLSA.) *See also Isaacson v. Penn Community Services, Inc.,* 450 F.2d 1306 (4th Cir. 1971), where the service of a conscientious objector, performing work in lieu of military service, was held not covered by the wage and overtime provisions of the FLSA. *Walling* was again cited as dispositive law. *Id.* at 1308–10.

activity and study they are pursuing resides with the Department of Education.

That many students, and some of their parents, may not believe that cafeteria duty is educational is, of course, their prerogative. They may attempt to revise the educational goals promulgated by the Department of Education through the ordered channels of change provided by our system of government.

It is this Court's belief, moreover, that it should not interfere with the workings of what has been traditionally a matter of local concern and competence—the education of the State's young people. This is especially so where defendants have not made a showing that the cafeteria duty is so devoid of educational value as to be classified as employment under the economic reality test.

It is not the Court's function, in this instance of statutory construction, to determine what education is to be for students of the State's public schools although, in the right circumstance of flagrant abuse, the Court undoubtedly has the power to do so. These, however, are not such abusive circumstances.

Accordingly, this Court finds that the plaintiffs have not stated a cause of action under the Fair Labor Standards Act [19] and for that reason their complaint must be dismissed.

### Conclusion

This Court, having dismissed plaintiffs' Thirteenth Amendment and FLSA claims, also finds it inappropriate at this time to deal with plaintiffs' complaint that the Department of Education acted beyond the scope of its authority in prescribing compulsory cafeteria duty and defers to the State courts on this issue.

Accordingly, plaintiffs' request for the convening of a three-judge federal district court is denied and their complaint for relief under the Fair Labor Standards Act is dismissed. Defendants' motion to dismiss on these two issues is correspondingly granted.

---

19. Because of this Court's disposition of the instant case, it does not reach the issue of whether the students engaged in cafeteria duty are employed by an enterprise engaged in the production of *goods* for commerce within the meaning of 29 U.S.C. § 203(i).